St. Agnes Cemetery, Claimant, v. State of New York, Defendant. (Claim No. 31967.)

Court of Claims, May 20, 1955.

*Joseph J. Casey* for claimant.

*Nathaniel L. Goldstein, Attorney-General (James G. Austin* and *Douglas S. Rider* of counsel), for defendant.

LAMBIASE, J. This claim has been filed to recover damages for the market value of a portion of claimant's land appropriated in fee and of another portion thereof appropriated for permanent easement purposes, and for consequential damages arising by reason thereof. The area appropriated in fee consists of 2.975± acres, and that taken for permanent easement use consists of an area of 0.246± acres.

The date of the appropriation is November 20, 1952, and the claim herein has been duly filed, has not been assigned, and has not been presented to any other court or tribunal for audit or determination by claimant.

The parcel appropriated in fee is described as follows:

" Map No. 14. Fee
" Parcel No. 15. Area = 2.975± Acres

St. Agnes Cemetery

(Reputed Owner)

" Map of property in the Village of Menands, County of Albany, which the superintendent of Public Works deems necessary to be acquired by appropriation for purposes connected with the highway system of the State of New York, pursuant to section 30 of the Highway Law, as amended.

"Parcel No. 15.

"All that piece or parcel of property situate in the Village of Menands, County of Albany, State of New York to be acquired in fee for the construction of Menands-Troy Bridge — S.H.———, as shown on the accompanying map and described as follows:

"Beginning at a point on the division line between the property of A. G. Lippincott (reputed owner) on the northwest and the property of St. Agnes Cemetery (reputed owner) on the southeast, said point being 129 feet distant southeasterly measured at right angles from station R 78+ 20± of the hereinafter described survey base line for the proposed construction of — Menands-Troy Bridge — S.H.———, Albany County; thence northeasterly along said division line a distance of 275.48± feet to a point, said point being 110 feet distant northwesterly measured at right angles from station R 79+ 57± of said base line; thence N. 78°–24' E. through the property of St. Agnes Cemetery (reputed owner) a distance of 531.06± feet to its intersection with the westerly right of way line of the Delaware and Hudson Railroad Corporation (reputed owner), said point being 118 feet distant northwesterly measured at right angles from station R 84+ 88± of said base line; thence southwesterly along said railroad right of way line a distance of 258.93± feet to a point, said point being 120 feet distant southeasterly measured at right angles from station R 83+ 86± of said base line; thence S. 78°–22' W. through the property of St. Agnes Cemetery (reputed owner) a distance of 566.07± feet to the point of beginning being 2.975 acres, more or less.

"The above-mentioned survey base line is a portion of the survey base line for the proposed construction of — Menands-Troy Bridge — S.H. ———, Albany County, as shown on a map on file in the office of the Department of Public Works and described as follows:

"Beginning at P. I. Station R 75+ 50, thence on a bearing of N. 79°–17' E. a distance of 550 feet to P. O. L. Station 81+ 00, thence continuing on a bearing of N. 79°–17' E. a distance of 440.97 feet to P. O. L. Station R 85+ 40.97.

"All bearings referred to true north."

And that appropriated for permanent easement is described as follows:

"Map No. 27.                              Permanent easement.
"Parcel No. 28.                           Area = 0.246± Acre

St. Agnes Cemetery

(Reputed Owner)

" Map of property in the Village of Menands, County of Albany, in and to which the Superintendent of Public Works deems the acquisition or exercise of a permanent easement, interest or right to be necessary for purposes connected with the highway system of the State of New York, pursuant to Section 30 of the Highway Law, as amended.

" Permanent easement for access driveway.

" A permanent easement for the purpose of constructing, reconstructing and maintaining thereon an access drive in and to all that piece or parcel of property hereinafter designated as Parcel No. 28, situate in the Village of Menands, County of Albany, State of New York for the construction of the Menands-Troy Bridge — S.H. ———— as shown on the accompanying map and described as follows:

" Parcel No. 28.

" Beginning at a point on the division line between the property of A. G. Lippincott (reputed owner) on the northwest and the property of St. Agnes Cemetery (reputed owner) on the southeast, said point being 110 feet distant northwesterly measured at right angles from station R 79+ 57± of the hereinafter described survey base line for the proposed construction of Menands-Troy Bridge — S.H.———— Albany County; thence northeasterly along said division line a distance of 63.63± feet to a point, said point being 165 feet distant northwesterly measured at right angles from Station R 79+ 89± of said base line; thence through the property of St. Agnes Cemetery (reputed owner) the following courses and distances: N. 78°–20′ E. a distance of 182.02± feet to a point, said point being 168 feet distant northwesterly measured at right angles from station R 81+ 71 of said base line; thence S. 10°–43′ E. a distance of 54.00 feet to a point, said point being 114 feet distant northwesterly measured at right angles from station R 81+ 71 of said base line; thence, 5.78°–13′ W. a distance of 214.03± feet to the point of beginning being 0.246 of an acre, more or less.

" Reserving to the owner but at such owner's risk, the right and privilege of using this property, providing the exercise of such right and privilege does not interfere with or prevent the user and rights herein described.

" The above-mentioned survey base line is a portion of the survey base line for the proposed construction of Menands-Troy Bridge — S.H.———— Albany County, as shown on a map on file in the office of the Department of Public Works and described as follows:

" Beginning at P. I. Station R 75+ 50, thence on a bearing of N 79°–17′ E. a distance of 550 feet to P.O.L. Station R 81+ 00; thence continuing on the bearing N. 79°–17′ E. a distance of 440.97 feet to P.O.L. Station R 85+ 40.97 = Station G 10+ 44.66.

" All bearings referred to true north."

Upon the trial, the amount demanded in the claim as filed was reduced to $327,000, of which amount $89,000 is claimed as the value of the land appropriated, and $238,000 as consequential damages by reason thereof. The State of New York contends that claimant's damages, both direct and consequential, amount to $26,000.

The purpose of the appropriation was to construct a new State road pursuant to plans and specifications identified as " Farc 52–90 Fash 52–13 Loudonville-Menands-Troy Bridge." The width of the taking of the fee portion is approximately 235 feet to 275 feet, the latter measurement being taken along the cemetery property line on a skew. The road built under the appropriation has been constructed on an embankment which is approximately 200 feet wide at its base and is 34½ feet high. The total width of the new road is 72 feet measured from edge of shoulder to edge of shoulder.

The width of the land taken for the easement is approximately 55 feet wide at right angles or 63.63 feet askew. Upon this land there has been constructed a so-called " access road " 20 feet wide with five-foot shoulders covered with bituminous concrete or black-top. The grade of the access highway is −7.9%, and its length is approximately 975 feet of which 190 feet are within the cemetery limits. As constructed or to be constructed said access road is for general public use and terminates short of any cemetery road or path.

The new State highway cuts across the cemetery and separates completely from the portion of the cemetery north thereof that portion of the cemetery south of it (Exhibit 35). It did not go through or involve any part of the cemetery in which there were interments. Directly and consequently affected by the appropriation is the area of the cemetery south of a shrine therein known as St. Joseph's Shrine, which area consists of about 13.939 acres and contains as shown on Exhibit 35 designed shrines one through six. A zoning ordinance of the Village of Menands, New York, in effect at the time of the appropriation and prior thereto, requires a 100-foot setback area to be maintained from Menands Road which borders the cemetery on the south; and, therefore, the land in said setback area was not available for sale or for interment purposes.

Claimant St. Agnes Cemetery was incorporated by act of the Legislature of the State of New York passed May 9, 1867. (L. 1867, ch. 853.) Since that time it has been, and at the time of the appropriation it was, a diocesan cemetery of the Roman Catholic Diocese of Albany, New York, under the supervision of the Bishop of said diocese, and serving for burial purposes approximately twenty-six Catholic Churches in and about the city of Albany, New York. According to Canon Law and to the regulations of the Roman Catholic Diocese of Albany, New York, all communicants of the Roman Catholic Church residing in the city of Albany, New York, and its immediate environs must, upon death, be buried in claimant St. Agnes Cemetery except for those persons residing in three parishes of the Diocese which parishes have small cemeteries of their own.

St. Agnes Cemetery is located in the village of Menands, town of Colonie, Albany County, New York, and is about two miles north of the city of Albany, New York. At the time of the appropriation it contained and it owned in fee in all, including the 13.939 acres hereinafter mentioned and with which we are immediately concerned, approximately 150 acres of land. It is bounded on the north and on the west by the Albany Rural Cemetery, on the east by the right of way of the Delaware and Hudson Railroad and on the south by Menands Road. Prior to 1938, the only actual means of access provided to claimant cemetery was by virtue of an easement over lands of the Albany Rural Cemetery. In using this easement, which was still the only access provided to the cemetery and in use at the time of the appropriation herein, it is necessary to cross the tracks of the Delaware and Hudson Railroad at grade.

In the years 1931 and 1938, claimant cemetery acquired 13.939 acres of land out of which acreage the State of New York appropriated the afore-mentioned 3.221 acres (in fee and for permanent easement). These acquisitions were made for the purpose, in part, of providing claimant with its own entrance and exit road. Although this proposed road over its own land was not yet in existence at the date of the appropriation, it had been provided for and set forth in various plans showing designed shrines in the proposed development of the cemetery, and particularly of that part thereof consisting of the 13.939-acre parcel, to which development we shall refer in greater detail hereinafter.

Up until 1951, the cemetery had always been operated as what is known as a " Monument Cemetery ". At that time part of the cemetery was converted into what has been described in the record as a " Shrine Garden ". In connection with the

development of the " Shrine Gardens " sections of the cemetery, claimant entered into a contract on or about May 25, 1951, with Cemetery Service Company of Kansas City, pursuant to the terms of which agreement it was required of said Cemetery Service Company to furnish to claimant for the development of the cemetery certain services the enumeration of which and of other features connected with said contract we do not deem necessary.

Pursuant to said agreement, the Cemetery Service Company designed several shrine developments within the cemetery, including the shrines set forth in Exhibit 35 and numbered thereon one through six with which we are immediately concerned herein; and at the time of the appropriation, in addition to said shrines which had been designed, there were several shrine gardens within the cemetery which had been actually developed, one of the latter being St. Joseph's Shrine which is also shown on Exhibit 35. Specifically, prior to the appropriation and between about July 1, 1951, and November 20, 1952, the date of the appropriation, the following shrines had been developed in other areas of the cemetery in the following order: (1) Queen of Heaven Shrine; (2) Sacred Heart Shrine; (3) St. Joseph's Shrine; and (4) St. Teresa's Shrine; and sales of lots and graves during said period of time had been made in all of said shrines.

The theory of the development of the garden shrines part of the cemetery was to " make a complete over-all plan of the cemetery, lay out each individual Shrine, start the development, one at a time, for a certain area; approximately five to seven hundred 4-space lots. While we were developing, we would sell lots in those areas." (S. M. 218, 219.) At the time of the appropriation no shrine had been constructed in the aforesaid parcel of 13.939 acres (shrines one through six, Exhibit 35), and no sales of lots or graves in said shrines had been made therein up to the time of the appropriation.

Portions of said designed shrines one through six (Exhibit 35) were appropriated directly in fee and for the permanent easement; and it is asserted by claimant that the unappropriated portions of the area containing designed shrines one, two, five and six aforesaid, by reason of said appropriation and of the purpose to which the appropriated land has been put, have been rendered of no economic or market value; and that the area containing designed shrines three and four for the same reasons has had its reasonable market value reduced 50%. Claimant has also placed a separate and specific market value upon the designed roadway shown as running generally northerly and

southerly at grade from Menands Road to St. Joseph's Shrine through said area of 13.939 acres occupied and abutted by said shrines one through six (Exhibit 35). Damages, both direct for actual taking and consequential to that part south of the embankment (S. M. 343), are claimed by claimant with reference to said designed cemetery roadway. Specifically, it is for the foregoing damages in this paragraph mentioned that claimant has filed this claim.

Evidence was adduced by claimant upon the trial tending to establish that just compensation for the appropriated parcels and for resultant damages by reason thereof should be determined on the basis of what the parcels involved were reasonably worth on the market at the time of the appropriation as land actually devoted to burial sites; and in that connection it offered evidence of contemporaneous sales of burial sites made by it in its cemetery unit and also by contemporaneous sales of burial sites by other cemetery enterprises, in similar cemetery units and conditions. The State of New York, on the other hand, objecting to the application of said measure of damages, urges that claimant's just compensation be based upon the market value of claimant's lands computed upon an acreage basis disregarding entirely the contention of the claimant that its land had been devoted for cemetery purposes, and maintains that a market value be applied to claimant's land on the basis of land not developed and devoted to cemetery use, but only as being merely adaptable to said use.

We permitted claimant to adduce its evidence along the aforementioned theory of damages for, in our opinion, such evidence seeks to establish '' what a willing buyer would pay in cash to a willing seller.'' (*United States* v. *Miller*, 317 U. S. 369, 374.) A willing buyer's inquiry '' would properly encompass an investigation of the facts as to the capacity of the parcel for burials, its location, past sales in this and other similar cemeteries, the reasonableness of the prices charged for individual burial sites, and in general its future prospects as they would appear to ' a willing buyer '. * * * The fact that there was no market or a limited market for such property is favorable to its admission.'' (*Cementerio Buxeda* v. *People of Puerto Rico*, 196 F. 2d 177, 180–181, and cases cited therein.) Continuing in the above-cited case, at page 181, the court said: '' The income derived from the sale of burial sites in this and other cemeteries was an ascertainable amount not based on speculative considerations. The income was not such that the skill of the management of the property was important. A prospective purchaser would

obviously look at the sale of burial sites made, the capacity of the cemetery, the cost of interment, etc. This is not to say that valuing the parcel is merely a problem in multiplication. Rather, such figures as sales and cost of interment, among others, are factors which would be considered by a prospective buyer and would help to form a basis for valuing the tract before and after the condemnation.'' (See, also, *Matter of Board of Water Supply of City of New York*, 277 N. Y. 452.)

We have considered the evidence thus submitted by claimant, as well as all evidence in the record submitted by the parties bearing upon the question of reasonable market value, in arriving at reasonable market value before and after the appropriation, the difference between such market values being the just compensation allowable to claimant for the damages sustained by it. In that connection claimant is entitled to have applied the market value of its lands at their highest and best available use. That use, upon this record, as of the date of the appropriation, was for cemetery purposes. The record contains no basis for any other reasonable conclusion.

Shrine gardens one through six (Exhibit 35), though not developed at the time of the appropriation, had been designed for and had been devoted to cemetery purposes as part of claimant cemetery, the diocesan cemetery for the Roman Catholic Diocese of Albany, New York, and over-all plans for their actual development and sale of lots therein for burial sites had been made prior to the time of the appropriation herein. St. Agnes Cemetery has been in existence since 1867, and up to the time of the appropriation there had been approximately 50,000 to 60,000 interments therein; and during the period of approximately five years prior to the appropriation, interments had averaged about 600 a year. As hereinbefore stated, because of Canon Law, Catholics of the City of Albany, New York, and its immediate environs, have to be interred in said cemetery. Death being inevitable to all humans, to a Catholic dying in the City of Albany, New York, and its immediate environs, burial in St. Agnes Cemetery, except as hereinbefore noted, is also inevitable. The fact that there were no burials in the appropriated parcel and in the area of the afore-mentioned six shrines is not determinative of whether or not it had been prior to the appropriation devoted to cemetery uses. On the contrary, the fact that there were no burials in the condemned parcel and in the afore-mentioned six shrines is the very reason that they have a market value to any prospective purchaser for cemetery purposes. When we consider all of the foregoing, the charter of the cemetery, the purposes for which it may purchase and

hold lands and the restrictions upon the amount it can own, the unity of its holdings, the reasons for its purchase of lands, and its association with the Roman Catholic religion, there can be and there is no question in our minds that our conclusion as to the highest and best economic use of the area of the aforesaid six shrines as of the date of the appropriation is sustained.

Claimant, in arriving at its claimed market values before and after the appropriation, used the premises shown on Exhibit 35 which include St. Joseph's Shrine along with the afore-mentioned six shrines. The State of New York in arriving at its asserted market value before and after the appropriation used only the area comprising shrines one through six aforesaid (Exhibit 35). As of the date of the appropriation there were available for burial purposes in claimant cemetery areas containing 3,720 lots, approximately all of which contained four graves each, in addition to the area set forth on claimant's Exhibit 35, that is shrines one through six immediately involved herein and St. Joseph's Shrine. However, claimant has not demanded damages by reason of the appropriation, directly or indirectly, to said St. Joseph's Shrine or to any other part of its cemetery other than to the aforesaid shrines one through six; and no benefit concededly has accrued to any part of the cemetery by reason of the appropriation. It is immaterial, therefore, whether or not the market value of other portions of claimant cemetery other than of said shrines one through six be included in arriving at the market value before and after the appropriation, for the market value of such other portions of the cemetery under the circumstances herein would be the same before and after the appropriation and the inclusion or exclusion of such market value would have no effect upon the ultimate amount of damages to be awarded, viz., the difference between the market value before and the market value after the appropriation. Therefore, the market value before and after the appropriation which we find and establish herein is that covering only the area containing the aforesaid shrines one through six (Exhibit 35), an area comprising 13.939 acres.

We have concluded upon the record that the over-all economic life of claimant cemetery based upon not only the 13.939 acres containing shrines one through six, but including all areas of the cemetery available for burial purposes as of the date of the appropriation on November 20, 1952, was forty years. (S. M. 321.) A purchaser would consider that fact and among other considerations connected therewith would also consider that over that period of time there would be a series of payments

made to the cemetery which, though reflecting value, for the purposes of this litigation would have to be translated into " present worth " or " present value " as of the date of purchase, in this instance as of the date of the appropriation. This would be accomplished by means of a discounting process wherein the future amounts thus received would be discounted for interest — a process depending upon several factors such as the rate or rates of interest employed, the time duration between payments, the time duration between conversions, that is, the time between compounding periods, and last, but not least, the premises assumed in providing for the return of the capital invested. Since a purchaser would consider the foregoing among factors to be considered, we, too, have done the same; and the rate of interest factor which we have used is 2% which is that adopted by claimant in its evidence and which has not been questioned by the State of New York as being a proper interest rate although as hereinbefore stated the State of New York objects to the entire theory of damages applied herein by claimant. And we have computed such future periodic payments on an annual basis there being, in our opinion, no justification for any other basis than an annual one.

In connection with the ascertainment of market value after the appropriation, we have considered that by reason of the appropriation and the use to which the appropriated land has been put, the remaining unappropriated portions of the area of the cemetery containing shrines one, two, five and six immediately following the appropriation were and now remain no longer suitable and available for burial purposes. Said parcels because of then existing local zoning ordinances may be used only for strictly residential purposes; and upon this record it has not been made to appear that as of the time immediately following the appropriation there was or could be any market or demand for them for such residential purposes or that they had and have any market value other than a nominal one. We, therefore, find the market value of said parcels immediately following the appropriation to be in the nominal amount of $1, and we have credited the State of New York with said sum of $1 in our ultimate figures.

Also in connection with ascertaining the reasonable market value after the appropriation, we have considered the area containing shrines three and four, by reason of the appropriation and the use to which the lands appropriated have been put, to have been consequentially damaged to the extent of 33⅓% of

its market value which it had immediately prior to and as of the time of the appropriation.

We have placed no separate market value upon and have computed no separate damage to the proposed cemetery road shown on Exhibit 35 since we have considered it as an adjunct of the shrine gardens lining it on both sides; and we have reflected the market value of said cemetery road in the over-all market value before and after the appropriation which we have placed upon the area comprising shrines one through six aforesaid, and we have, therefore, in our award of damages reflected the damage to it by direct appropriation of part thereof and the consequential damage to that part thereof south of the embankment.

We have considered the appropriation for permanent easement as the taking from claimant of everything except the bare naked title to said parcel thus appropriated. We have allowed damages on that basis. We find that the market value of said naked title is the nominal sum of $1, and that the market value of the reservation " to the owner but at such owner's risk, the right and privilege of using this property, providing the exercise of such right and privilege does not interfere with or prevent the user and rights herein described " contained in said easement is also to be the nominal sum of $1, and we have credited the State of New York with said sum of $2 in our ultimate figures.

As required by subdivision 4 of section 12 of the Court of Claims Act, accompanied by representatives of both the claimant and of the State of New York, we viewed the premises affected by the appropriation.

We conclude and we find that the reasonable market value of the area of claimant cemetery comprising 13.939 acres and containing shrines one through six, immediately before and at the time of the appropriation was $265,000, and that the reasonable market value of claimant's remaining unappropriated portions of said area aforesaid immediately following the appropriation was $56,000; and we find that claimant has been damaged in the sum of $209,000, viz., the difference between the market value before and the market value after the appropriation, which sum of $209,000 we award to claimant with interest thereon from November 20, 1952, the date of the appropriation herein, to May 20, 1953 (Court of Claims Act, § 19, subd. 1), and from July 9, 1953, the date of the filing of the claim herein in the office of the clerk of this court, to the date of entry of judgment herein.

Claimant's motion (S. M. 783–785) to strike out testimony is denied.

The foregoing constitutes our written and signed decision herein. (Civ. Prac. Act, § 440.)

Let judgment be entered accordingly.