MOUNT HOPE CEMETERY ASSOCIATION, Respondent-Appellant, *v.* STATE OF NEW YORK, Appellant-Respondent. (Claim No. 32859.)

Third Department, August 2, 1960.

*Louis J. Lefkowitz, Attorney-General (Henderson G. Riggs* and *Paxton Blair* of counsel), for appellant-respondent.

*Dorr, Hand, Whittaker & Watson (Rush Taggart* and *Seth M. Dabney, III,* of counsel), for respondent-appellant.

BERGAN, P. J.   Claimant is a membership cemetery corporation.   For Thruway purposes the State in March and April, 1954, appropriated about 16½ acres of its land in the Town of Greenburgh, Westchester County.   This acreage was vacant and undeveloped at the time of appropriation, but was being held by claimant for future cemetery use.   For direct and consequential damages the Court of Claims has made an award of $763,732.16, which with interest has resulted in a judgment of $911,387.05.   Both sides appeal.   The State argues the award is excessive and should be $285,000; the claimant argues it is inadequate and should be $3,286,558.   It is our view of the case that, considering the whole result of the taking and the specific components which enter into damages, the award is too high and should be reduced.

Although the State argues that a substantial part of the downward revision which it seeks in the judgment would follow from certain mathematical miscalculations which it attributes to the Court of Claims based on elaborate formulæ which it attaches to its brief, the claimant by equally elaborate formulæ, although it disputes elements in the calculations, seeks to demonstrate that the State, in turn, is mistaken in its computations, and that the Judge, as far as bare calculations go, was right.   The State does not further answer this challenge, and the calculations and cross calculations are thus left with us without further resolution.   For the rest, aside from mathematical processes, the accuracy of almost every important factor which enters into the result is challenged by claimant.

Claimant is entitled to the fair value of the land taken and to damages to the remaining land for consequences of the taking; but in undeveloped cemetery land there is some difficulty in finding the value, since the price for which cemetery lots are sold at a particular time must be considered against the cost of developing raw land for cemetery purposes and the provision

of access and facilities for the lots; the cost of sales; and the cost of maintenance of the cemetery lots. Such maintenance costs are not expected to be incurred as to appropriated land when public authority takes it for noncemetery uses.

Some weight must also be given to the fact that the lots would not be sold at once and thus sale would be expected to be deferred to a future time instead of becoming at once payable as is a final judgment of the Court of Claims. Some of these problems were considered in *St. Agnes Cemetery* v. *State of New York* (3 N Y 2d 37, affg. 1 A D 2d 517, affg. 208 Misc. 171).

Since cemetery lots are sold in square-foot quantities, it has been convenient for the Court of Claims to equate all quantities of land on a square-foot basis and part of the difficulties between the parties over calculations arise from the conversion from square feet to full acres or to " salable " acres, which constitute the portion of an actual acre which can be sold, and back again to square feet.

Both sides seem to agree in the statement made in this court by claimant that the gross sales price of the land " is the basic factor " in calculating damage. The Court of Claims found that basic factor to be $4.81 per square foot. This was based on the sale of 105,125 square feet from 1952 to 1956 for $505,833.50. The State accepts this figure; claimant argues it is too low. Since it is a crucial point in the case we examine it first.

The Court of Claims reached this amount by an examination of exhibits extracted from claimant's books, which showed this to be the average gross sales price for all lots and single graves for a five-year period ending March 31, 1956, a period partly before and partly after the taking.

Claimant argues that a shorter period should have been used as a test, and suggests as a period the six months immediately before the taking, which would indicate an average gross sales price of $5.09 per square foot (11,093 square feet sold for $56,441.50). Claimant contends that the increase in value during the period at issue is the reason why a more limited time sampling of actual sales, and that very close to the time of taking, should be made.

The samples used by the court cover a period before and after the taking and since the value of cemetery lots does not fluctuate rapidly and is reflected in long-time trends, the method based on claimant's actual five-year sales experience seems reasonable and we agree that it was properly used as a fair base by the Court of Claims.

Since, as we have seen, all of a cemetery acre is not sold to purchasers of lots and graves, but some is kept by the cemetery

for roads, paths and other facilities in connection with the use of lots, the whole 43,560 square feet in an acre is not salable land and the court found that 32,592 square feet in each acre were salable. This figure is accepted by both sides.

The gross sales price per salable acre, therefore, would be, as the State in its argument based on purported miscalculations says, $156,767.52 ($4.81 by 32,592) rather than $209,523.60 ($4.81 by 43,560) as found by the Court of Claims. For the purpose of decision, therefore, when we refer to a " salable " acre we mean 32,592 of every 43,560-foot total acre, and when deductions are made against such a footage and not a gross acre, we make deductions at the rate of 32,592 feet. This would apply to selling costs per salable foot.

As to some deductions, however, for example the development cost of an acre, a total acre of 43,560 feet must be developed, although only 32,592 feet are sold, but the cost of development of the whole acre must be charged against the smaller quantity which is sold.

Although the calculations of the claimant seek to demonstrate that, because of compensatory factors, this comes out at the same place in the end, we agree with the State that the basic gross sales price per salable acre should be $156,767.52; but we hold that the 32,592-foot acre should be applied consistently to all successive steps; and in this respect we agree with the claimant that the State has made miscalculations in conversion and in some respects similar to those the State attributes to the Court of Claims.

A cemetery corporation rests under a statutory duty to make certain dispositions of " the gross proceeds of the sale " of every cemetery lot (Membership Corporations Law, § 86-a). It must " deposit " not less than 10% of such gross sales price in " the permanent maintenance fund " which is " a trust fund, for the purpose of maintaining and preserving the cemetery " and it must have " deposited " in the " current maintenance fund " an " additional " 15% " of the gross proceeds of the sale ".

The current maintenance fund, as the statute runs, " shall be used and applied " for the " sole purpose " of ordinary and necessary expenses of the care and maintenance of the cemetery. When all the burial rights " have been conveyed " the current maintenance fund shall be transferred to the permanent maintenance fund (§ 86-a, subd. 3).

The Court of Claims deducted the statutory 10% required for deposit in the permanent maintenance fund from the gross sales price per acre; but did not deduct the additional statutory

15% required for deposit in the current fund. The State argues that these funds are not distinguishable; but claimant, accepting, in the words of its brief, the 10% as "the actual measure of the liability to provide care and maintenance of which claimant was relieved by the appropriation", argues that the additional 15% "has no relevance in computing the award".

If one has relevancy, as we agree with the Court of Claims and the parties that it has, the other seems to us not distinguishable in principle. Both funds, which the cemetery is required to deduct from gross sales price and put aside and maintain in a special way, have the same basic statutory purpose: to protect the owners of cemetery lots from dissipation by the cemetery of resources to maintain the lots and access to them. Both funds impose a statutory duty which deprives the cemetery of free use of a definite part of proceeds of sales of lots.

Under the compulsion of law, either the income from the trust fund is used for the maintenance and preservation of the cemetery grounds; or the "fund" shall be used for the "sole" purpose of ordinary and necessary expenses "of the care and maintenance of the cemetery". This is a different expense from any calculated as part of the items involved in preparation or sale of the land and it is a compulsory allocation of proceeds of sales which has an effect on damage.

To set up either fund, the money must be deducted from the sales price and kept apart in connection with the use of the lands sold as cemetery lots or graves. It is a statutory deduction made necessary for a special use connected with the sale; and whether it provides, as does the permanent fund, a source of permanent income for this maintenance, or whether it is set up as a revolving and accessible fund for maintenance and is actually spent therefor, the cemetery is equally relieved of the need of expending any money permanently or currently in connection with lands taken by the State and used, not for cemetery lots, but for a Thruway.

If from one part of the statutory obligation, claimant is, in its own words, "relieved by the appropriation", it is equally relieved of the other. Indeed, a residue in the current fund, as it has been seen, goes in the end into the permanent fund.

It may well be, as the claimant also argues, that in the case of a nonprofit membership corporation all of the money received is dedicated to the general purposes of the cemetery, which would be quite similar to those provided in the statutory current maintenance fund; but this does not necessarily follow, and we can readily conceive fees, salaries and other facilities to drain away cemetery resources. The general purpose is,

therefore, quite the same as a mandatory statutory obligation; and it seems to us that the fact the State takes the land for a Thruway relieves the claimant of all further care, concern, or expense connected with that land and the need for statutory funds in connection with the land does not exist.

It is unnecessary now for us to state whether we agree with *Keith* v. *Maple Grove Cemetery Assn.* (208 Misc. 217, appeal dismissed 1 A D 2d 665), but if claimant feels obligation to maintain the statutory funds from money received from an award it is entitled to seek from the Supreme Court appropriate relief. (Membership Corporations Law, § 86-a, subd. 4.)

There are two other elements of deduction from the gross sales price as found by the Court of Claims disputed on claimant's appeal. The court found the development costs of claimant, i.e., the expense of preparing raw land for use for cemetery purposes, to have been $25,082 per acre.

This amount was arrived at by taking all post-war development costs of claimant in the period October 15, 1946 to December 1, 1955, involving a total of 8.16 acres (355,260 square feet), costing $204,573.32, which averaged out $25,082 an acre. Although this is the average, there are very substantial differences in the actual per acre costs during this period, ranging from $11,809.12 per acre (1946) to $76,761.43 (1953).

Claimant argues that this area (8.16 acres) is not only small in relation to the whole; but involves terrain quite different from the land taken by the State and that about one third of it is '' the highest cost development property in the cemetery ''. One section (No. 99) of 24,881 feet alone cost $43,845.11 or $1.7622 a foot; and was in an area unusually difficult to develop. Still the samples accepted by the court seem to involve both high and low cost development. For example, it includes 149,118 feet at $.2711 a foot in 1946; and it seems probable that costs will not be cheaper in the future than the $.5758 a foot which is the result of the court's finding. No development for less than 50 cents a foot has been effected since 1950. We hold that the samples taken as a base by the Court of Claims are appropriate.

Claimant as appellant sharply disputes the further finding of the Court of Claims that the selling cost per salable acre was $60,853.32. But that figure was computed by the court on the basis of material in a report filed by the claimant with the State Cemetery Board.

Expert accountants contend that the allocation to selling expenses in this report was ill-advised and poorly considered. For example, the accountants felt that accurate time checks of

exactly what each employee did in the total activity would show a lower allocation of total time to sales costs, or to the overhead attributable to sales. Still we have difficulty in holding that the court was wrong in basing its computation on these reports of the officers of the cemetery who personally controlled and understood the operation as it was actually done, and we agree that a finding of sales costs of $60,853.32 is sufficiently grounded in the record to be sustained.

We pick up now the thread of the State's calculations. From $156,767.52, the gross sales price per acre, the State would deduct 25% or $39,191.88 as statutory obligations from which claimant is relieved, leaving a balance of $117,575.64 per acre, and this seems correct.

It is clear that in the Court of Claims' calculations the two expense items, cost of development and cost of sales, were worked up on the basis of square feet actually sold; and, therefore, these amounts, when translated to acre costs ought to be seen in relation to a 32,592-foot acre actually sold.

In each instance, however, the basis employed in reaching a cost "per acre" was 43,560 square feet. The selling costs should be reduced from $60,853.32 for a full acre to $45,531.02 for a 32,592-foot salable acre, but the development costs, which include the cost of development of 43,560 ground feet to produce 32,592 salable feet, should be left at $25,082 which is the cost of developing a full acre.

Examining these calculations all together, we deduct from $156,767.52 the gross price per salable acre $39,191.88, equal to 25% for statutory funds; $25,082 for development, and $45,531.02 selling costs, a total of $109,804.90, leaving a net surplus, undiscounted, to the cemetery per salable acre of $46,962.62.

This compares with the court's finding of $102,635.92 and the State's ultimate contention for $31,640.32. Divided by 32,592 feet, this produces a net surplus per salable foot of $1.44. The court found the average annual sales to be 23,460 feet. Accepting this, the annual net surplus is $33,782.40.

Since, as we have seen a cemetery must wait for a considerable period before realizing the sale of its available salable plottage, a "discount" factor was adopted by the Court of Claims to be applied to the net surplus per salable acre.

The court went about this process by finding that the projected economic life of the whole cemetery was 138 years. This projection was reached by taking from claimant's books the average annual sales in the period 1923–1957, which was 23,460 square feet, and applying this to all the unsold balance of available land. On the basis of this it was estimated by the court that all

the available land of the cemetery would have been disposed of in 138 years. To the Court of Claims, the actual rate of sales over the past 25-year period seemed an accurate way of reaching this question of future projection; but the claimant argues that the population growth of the area and the shortage of cemetery lands suggests a much more rapid sale of all the lands; and two expert witnesses testified for claimant that the economic life of the cemetery would be from 55 to 57 years.

But a shorter and somewhat more recent sampling of actual sales from claimant's records does not suggest any current acceleration in sales, but rather a slower rate. For a 20-year period, 1937 to 1956, the annual average shown by claimant's exhibits was 19,456 square feet sold, with the highest single year, 24,735 square feet, in 1937. The 1956 sales amounted to 18,990 square feet.

An economic life of 138 years, however, seems to us so long as to be unrealistic and the experience of 20 or 25 years is not necessarily reliable in such a long future projection. Moreover, we are attempting to project the economic future of the actual land taken; and claimant demonstrates that this land, easier and cheaper to develop for cemetery lots than some of the hilly and rocky sections of the project, would certainly be sold earlier. All such economic projections into the future are speculative, but some practical solution must be found.

The Court of Claims in its discounting process of valuation used the 138 years which it had found as the future economic life of the whole cemetery as a basic factor. It found that from the annual sales of footage in the past, less costs which it, deducted, the claimant had had a net surplus per foot of $2.3562, and since it sold an average of 23,460 square feet a year over 34 years, the court concluded claimant had an " average annual " net surplus of $55,276.45.

To this it applied by multiplication a factor called Inwood Factor of 46.748. This factor is based in tables which show this amount as " the present value of $1 per annum ", i.e., " the present worth of an annually recurring saving, rental or income of $1 a year " at 2% for 138 years (see McMichael, Appraising Manual [4th ed.], p. 92, table I).

Although we have some reservations about the appropriate application of the formula to the specific problem before us where basically we are attempting to determine the present value of the property which could not be sold until some time in the future and for which an immediate payment will be made by the judgment, the State, the claimant and the Court of Claims alike regarded the factor and the method of its applica-

tion appropriate to the case, the parties do not question it on appeal, and in the revisions we will make in computations of damage, we will use it.

The Court of Claims, multiplying the average annual net surplus of $55,276.45 by the Inwood Factor of 46.748 for 138 years, found $2,639,339.93 as the discounted market value of claimant's salable lands before appropriation, and by dividing this by 74.3 acres remaining, the court found what it terms the discounted market value per acre of the land before appropriation of $35,522.74. This became the basic element in the award for all damage found.

We think that an economic life of 55 to 57 years as submitted by claimant is too short for the whole cemetery. The Court of Claims projected the economic life on the basis of the future sale of all footage left. It seems clear that some of the cemetery will be sold more slowly than the part appropriated. Thus, the rocky ridge of 14.857 acres will be very late in development and sale if it is ever developed. Front lawns and odd lots will have little relation to the future sale of the part taken.

Our revision of the over-long economic life period used begins by deducting these two types of land from the total. From 74.3 acres we deduct 21.59 (14.857 acres of rocky ridge plus 14 acres of front lawns and older plots by .7482) to leave 52.71 acres of developed land, or 2,296,048 salable square feet. Disposal at the annual rate of 23,460 square feet would require 98 years, producing an Inwood Factor of 42.82, which when applied to the annual net surplus results in a discounted market value for 52.71 acres of $1,446,562.37 or $27,443.78 per acre.

In addition to the award based on the actual taking of 16.45 acres of land, the Court of Claims allowed $326,752.79 for consequential damages. Part of this is based on the fact that the Thruway will be adjacent to the cemetery and hence adversely affect the value of the nearby cemetery land; and part to the fact that sections of the cemetery are cut off from the main body of the cemetery land or otherwise adversely affected. We regard this allowance, which is about 80% of the total amount the court allowed for the land taken also as too high.

The Court of Claims treated as totally damaged, although not appropriated, a strip of 100 feet on each side of the State's right of way line. On appeal the State's argument is not that no total damage results from adjacency to the Thruway, but rather that the measurement of the area adversely affected by traffic noise should begin at the edge of the pavement rather than the boundary of the State's right of way.

Since there is a 78-foot strip of State land between the edge of the pavement and the State line, the State argues this should be deducted from the 100-foot area in which the Court of Claims held there was total damage, leaving an affected strip of 22 feet on each side for which the State concedes damage of 100%.

On the other hand claimant argues that 100% damage for the area beyond the State lines is wholly justified and that '' the noise and disturbance '' created by the '' heavy traffic on the Thruway '' have substantially changed '' the quietude and tranquility of the cemetery in the country ''.

There is opinion evidence in the record of depreciation in this respect; but we regard these opinions as speculative and theoretical. There is, of course, traffic noise on the Thruway; but the cemetery is also adjacent to the Saw Mill River Parkway; and the traffic there has been heavy for years. Some of the best developed areas of the cemetery, as well as its principal approaches and lawns, have directly abutted the parkway; and beyond the parkway is a railroad. Thruway traffic fluctuates and it is not satisfactorily demonstrated that 100 feet on each side of the State's right of way will be 100% lost to the cemetery at a cost to the State, under the Court of Claims decision of $185,379.90.

We think there is possibly some depreciation, but that it is not large. We are of opinion that it does not exceed the amount which the State concedes and which it computes by treating the loss as 1.5354 acres.

The court found that a triangular tract of cemetery land cut off from the rest of the cemetery had been damaged by 15% in addition to the strip near the Thruway, the depreciation of which has just been discussed.

Claimant argues that this is far too low; that the triangular parcel which consists of 18.252 acres has been so cut off from the rest as to require treatment as almost a separate cemetery; and that it has been damaged at 50%. We do not find it has been damaged to this extent; but that it has been damaged at 20%. Adding the excluded 78-foot strip east of the Thruway to the 18.252 acres produces 20.537 acres (18.252 plus 2.930 minus .645). Twenty per cent damage to this area is the equivalent of 4.11 acres.

One other triangular parcel of 1.867 acres was taken and is not disputed by the State; but another triangular parcel of 4.784 acres was found partially damaged. The location and character of this parcel indicates that it has not been damaged at all by the taking; and no real interference with it or the

character of its use has been demonstrated, and accordingly it is found not to have been damaged.

Looking at the problem as a whole, and putting aside for the moment the intricate detail of price per square foot, cost of sales and development, and the economic consequences of sales far in the future, the financial statement prepared for claimant by Price, Waterhouse and Company, its accountants, shows total assets belonging to the cemetery as of March 31, 1957 of $1,016,452.02. This, of course, is based on land at cost; but it includes the total assets of the cemetery association including cash and other property. The award consequent upon the State's taking this strip of land, relatively small in relation to the whole, is almost 80% of this estimate of all the assets. It is true, of course, this is not fully controlling on the issue here, but the award seen in this aspect seems to loom very large in relation to the entire cemetery project considered as a whole.

We find a total taking, or, following the theory of the Court of Claims' decision of consequential damage measured in terms of percentage of land actually taken, of 17.83 acres. Applying the discounted fair value per acre of $27,443.78, we find the claimant's damage to have been $489,322.60 ($27,443.78 by 17.83).

The judgment should be modified on the law and the facts to reduce the award to the claimant to $489,322.60, with interest and as thus modified affirmed, without costs.

Coon, Gibson, Herlihy and Reynolds, JJ., concur.

Judgment modified, on the law and the facts, to reduce the award to the claimant to $489,322.60, with interest and as thus modified, affirmed, without costs.