*39 Burke, J.
This appeal involves an award made by the Court of Claims for a portion of claimant’s cemetery land, appropriated by the State Highway Commission for highway purposes. This cemetery is located two miles north of the city of Albany and has been in existence for almost a century, during which time there have been over 50,000 interments. Prior to this appropriation which occurred in 1952, the cemetery contained about 150 contiguous acres of land. The condemned strip traverses and bisects a parcel of almost 14 acres of land located at the southern extremity of the cemetery. This particular parcel was acquired by the cemetery in 1938 not only to meet the growing demand for cemetery plots, but because it fronted on a public highway to the south, from which an exclusive, safe and convenient means of access could be had. Prior to this acquisition, the only means of ingress and egress to and from this cemetery was over a roadway easement through another cemetery which intersected a railroad track at grade level, a way which was inconvenient for the people of Albany due to a general westward shift in the population of that city. By 1951 this parcel, as well as the adjoining cemetery property, was improved by arranging it as a modern garden-type cemetery— that is, in place of the headstones which are found in a monument cemetery, there are bronze markers set in concrete at ground level which gave the area a park-like appearance. As part of this improvement, plans were drawn for the construction of a memorial entrance abutting the highway to the south with a central drive extending from the entrance to a memorial statue in the interior portion of the cemetery which provided a suitable theme for the new entrance. From the highway on the south there would be an unobstructed view of the new entrance, the central drive with a series of separate gardens on each side and the memorial statue. The improvement by the State raised an embanked four-lane highway over the condemned strip which destroyed not only the access through this new entrance on the south, the cemetery lots in the area taken by condemnation, but also depreciated the value of the cemetery lots north of the new highway and the lots south of it in the separated portion of this parcel.
*40 As the Appellate Division has affirmed the judgment of the Court of Claims “ in all things ”, the facts are not open to our review. Likewise, as the finding of value is supported by substantial evidence, it also is ‘ ‘ immune from further review ’ ’ (Matter of City of New York [Sound View Houses], 307 N. Y. 687, 688).
Thus, the sole issue presented by this appeal is. whether the finding of value is the product of the application of an erroneous principle of law (Matter of City of New York [Exterior St.], 285 N. Y. 455, 458).
The State charges the courts below with the adoption of an illegal measure of damages in determining the value of a cemetery property. The criticism is not that there is a lack of testimony in the record supporting* the valuation but rather that an improper theory of appraisement was used. It is the State’s position that the damages are to be measured by the value of the cost of replacement of the land. The loss to this particular cemetery, at maximum, it says, is the cost of replacement.
The trial court, the State contends, capitalized net profits to arrive at the value of the property. Such a statement is best tested by an examination of the method of valuation or appraisal resorted to by the court. The Court of Claims, following the general rule, found the reasonable market value of the affected area of the cemetery before appropriation and after appropriation (Matter of Prospect Park & Coney Is. R. R. Co., 13 Hun 345, 347). In determing the value before and after appropriation, the court referred to the sales prices which the cemetery had obtained for the sale of burial lots located in the adjoining garden sections. The value of the burial lots in the affected area of the cemetery was determined by applying the unit value based on the average sales price per lot, less sales costs, of the lots sold in the adjoining garden sections to the number of lots affected. Thus, the court, after so averaging the total number of affected lots—having used the unchallenged sales prices of $400 each for immediate need lots and $300 each for pre-need lots and having deducted the sales costs — found the value to he $147,50 per lot. It determined the present value by further discounting from the total value of the affected lots ($147.50, the value of each affected lot, multiplied by the total number of such lots) the amount of 2% per annum on the amounts receivable each year in equal installments over a period of *41 40 years, which it determined to be the economic life of the cemetery as a whole.
In arriving at the value of the appropriated cemetery property, the trial court considered the methods used by the State’s witnesses and the methods adopted by the witnesses called by the claimant. The court states the value at a different figure from that given by the experts. This is a finding of fact which we cannot disturb unless a rule of law was violated.
Speaking generally of methods of valuation, this court stated in Matter of City of New York (Fourth Ave.) (255 N. Y. 25, 30): “ The experts, as well as the judge, may have many different methods in arriving at the same point or at the value of the whole. These considerations are mere matters of evidence to prove facts. As long as competent evidence is received, and none excluded, no rule of law is violated, if the main purpose is served of ascertaining the value of the whole ”.
The legal questions raised here, although simple in theory, at times have proven difficult of practical application to the circumstances in which they arise.
It is axiomatic that in appraising land the fundamental question to be answered is “ what has the owner lost, not what has the taker gained” (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195 [1910]), and that an owner whose property is acquired by condemnation is not limited in compensation to the use which he made of his property but is entitled to receive its market value “ based on the most advantageous use ” (United States v. Miller, 317 U. S. 369, 375; Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, 82, affd. 279 N. Y. 656; Olson v. United States, 292 U. S. 246).
This, of course, does not mean that if the property by reason of its particular use is worth more for that particular use than any other, its market value will not be so measured. "Where property has a higher value because of a restricted use than what might otherwise be the value of the highest and best use of property so situated, the value resulting from the restrictive use is, of course, the highest and best use of that property (Sanitary Dist. of Chicago v. Pittsburgh, Fort Wayne & Chicago Ry. Co., 216 Ill. 575; Pittsburgh & Western R. R. Co. v. Patterson, 107 Pa. 461; Matter of Port of New York Auth. [Lincoln Tunnel], 2 N Y 2d 296; Mattydale Shopping Center v. State of New York, 303 N. Y. 974).
*42 In United States v. 1 Acre of Land More or Less in Pulaski County, Virginia (W. D., Va., decided June, 1945, unreported, D. J. File No. 33-48, 228-4), where the United States condemned a private cemetery, the court valued the land for cemetery purposes. The court said: “Even if we consider that, because private cemeteries are not commonly bought and sold, this property has no market value, or that its market value is impossible of ascertainment it does not follow that the compensation for it must be based on its adaptability for an entirely different use. . . . But the fact that there might be many more potential purchasers of the land for farm purposes and that a sale for such purposes is more readily negotiated does not require that it be valued on that basis. The law does not limit market value to that based on the use for which land may be most readily and easily sold. Common knowledge might suggest that a purchaser desiring to continue the use of this property for a private cemetery would probably not be easily found but it is not impossible that there is such a market, nor it is impossible in view of the improvements on the lot, that a purchaser might be willing to pay for it a sum greatly in excess of that which it might bring if acquired for other purposes. ’ ’
Recognition of the unique value of cemetery property may be found in Fidelity Union Trust Co. v. Union Cemetery Assn. (104 N. J. Eq. 326) where the court said “ land, when dedicated to the burial of the dead, acquires an unique value by the grace of its consecration and the exclusiveness of the cemetery franchise.” (See, also, East Ridgelawn Cemetery v. Winne, 11 N. J. 459.)
In the cases dealing with restricted uses which allow the land to be valued on the basis of surrounding lands, either no evidence was introduced valuing the land for purposes to which the property had been devoted, or such use had been abandoned or the property had not been developed and improved for the restricted use. (Westchester County Park Comm. v. United States, 143 F. 2d 688 [C. C. A. 2d, 1944], cert. denied 323 U. S. 726 [1944] [park]; Laureldale Cemetery Co. v. Reading Co. 303 Pa. 315 [cemetery]; Matter of Board of Transp. of City of New York, 140 Misc. 557 [abandoned cemetery]; George Washington Mem. Park Cemetery Assn. v. Memorial Development Co., 141 N. J. Eq. 47, 54 [new cemetery].)
*43 The George Washington case (supra) involved a fraudulent scheme of a development company to overcharge a memorial park association for land unimproved for the restricted use. The court (p. 58) described the property as “ virtually a wilderness ”.
In the Westchester County case (supra, p. 692), the court stated: “It may be that, if the County had proved the worth in money terms of the use as a park site, it would be entitled to compensation therefor. But we need not here consider that question since, although the County was at liberty to do so, it presented no evidence on that issue.”
In the Laureldale case (supra), the railroad company appropriated 8% acres of undeveloped land in a remote part of Laureldale’s 117-acre tract. Therefore the court ruled that since the portion of the new cemetery taken was merely adaptable for cemetery purposes, it was not to be valued as cemetery property.
The Laureldale Cemetery bears no resemblance to the claimant property. The Laureldale Cemetery was three years old. Only a minute part of the 117-acre tract had been developed. Claimant cemetery has been active for 85 years, and has had a steady growth and development. At Laureldale Cemetery only 417 interments had been made. At claimant cemetery, over 50,000 interments had taken place. As the court in Laureldale said (p. 323), the land taken was a “ current liability rather than an asset ”, Here claimant had acquired the additional land 14 years before the appropriation, as necessary for its continued and proper operation and essential to its needs in serving the demands of a growing* clientele. All the land held by claimant consisted of a single unit of land, whereas the Laureldale property consisted of three tracts of land separated by highways and a railroad and the condemnation was, in fact, for the purposes of the already existing railroad.
In Cementerio Buxeda v. People of Puerto Rico (196 F. 2d 177, cert. denied 344 U. S. 876), the court rejected the doctrine applied in the case of Laureldale Cemetery Co. v. Reading Co. (supra) as erroneous and in any event not controlling where cemetery property of a well-established cemetery has been appropriated. In a 1953 proceeding, the real estate expert for the Highway Department of Pennsylvania, after due consideration, reached the same conclusion. In 1952 the Highway Depart *44 ment of Pennsylvania condemned 12.327 acres of the cemetery property of Easton (Pa.) Cemetery and severed an additional 11.172 acres. Some of the property was wooded and undeveloped. Some areas were unsuitable for interments. Considering the Laureldale case inapplicable, the expert for the Highway Department of Pennsylvania and the expert for the cemetery appraised the property as cemetery property, a value which reflected its highest and best use. (Finkel, Condemnation Appraisal of a Cemetery, Appraisal Journal, July, 1955, American Institute of Appraisers, pp. 379-386.)
Hence the weight of authority supports the rule that if the land taken is an integral though unused portion of a well-established cemetery, that is, a portion of a cemetery in which there have been no interments and no sales of graves, the property should be appraised on the basis of its value for cemetery purposes. The fact that there were no burials in the condemned or consequentially damaged parcels is proof of damage to the cemetery (Cementerio Buxeda v. People of Puerto Rico (196 F. 2d 177, cert. denied 344 U. S. 876, supra). The quantum of damage depends on the value of the plots. The unit of appraisal may be the value per square foot of the burial plot or the value of the burial plot as a whole (Finkel, Condemnation Appraisal of a Cemetery, supra; Cementerio Buxeda v. People of Puerto Rico, supra; Elmhurst Cemetery Co. v. Commissioner of Internal Revenue, 300 U. S. 37, 39). The law is well settled that market value can only be established by sales of other property in the vicinity which is similar to the property taken (Court of Claims Act, § 16; Village of Lawrence v. Greenwood, 300 N. Y. 231).
In valuing cemetery property, evidence of the value of the burial lots founded on the net sales prices of similar burial plots shows the productiveness and capabilities of the land taken for yielding income as bearing on value — the present value — of the land itself.
In Elmhurst Cemetery Co. v. Commissioner of Internal Revenue (300 U. S. 37, 39, supra), the United States Supreme Court said in passing upon the valuation of cemetery property “ ‘ We are of the opinion that the valuation for which the petitioner contends is reasonable and should be allowed. It is based upon actual sales [of burial plots], and consequently comes as closely as may be to that fair market value, so often judicially defined *45 as the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell. ’ ”
There is ample authority that testimony as to future income has been accepted as evidence which has probative value. We recently approved an award made at Special Term, based on the rental of land used for a gasoline service station. The stated rent was allowed as a predicate for the appraisal of the value of the land rented, not only for the period of the lease term of 15 years, but for the additional period of a 5-year renewal option at the same net rental (Matter of Port of New York Auth. [Lincoln Tunnel], 2 N Y 2d 296, supra). The use, i.e., gasoline service station, was a temporary licensed use, subject to revocation.
In Mattydale Shopping Center v. State of New York (303 N. Y. 974, supra), an award of the Court of Claims was reinstated which was based on evidence that the claimant intended to build a shopping center. Claimant’s testimony showed the execution of four leases for space therein and established, by expert testimony, the rental value of the unrented proposed stores in the not-as-yet-constructed shopping center.
Superficially it would appear in these cases that the trial court reached a value derived from capitalization of profits, a theory of appraisal which has been condemned (United States ex rel. T. V. A. v. Powelson, 319 U. S. 266) but actually this court, conscious that business profits are not allowable, adopted the rule that present value of “ clearly to-be-expected future earnings may be considered” (Brooklyn Eastern Dist. Term. v. City of New York, 139 F. 2d 1007, 1013 [C. A. 2d], Ann. 152 A. L. E. 296, 307, cert, denied 322 U. S. 747). The method of valuing real property on the basis of earnings past as well as prospective was considered appropriate in those cases. The Court of Claims has utilized that method as supported by actual sales. In this case the theory of damage and method of appraisal are based upon a proof of loss of the value of the land itself, not a capitalization of profits. The circumstances of an established cemetery are less subject to change than business enterprises, and offer a safe guide to value. Certainly the future prospects of this cemetery are not as speculative as a planned shopping center or a gasoline station. Because of the inevitability of death, the demonstrated experience of the cemetery, the *46 increase in population of the capital district, the future of this cemetery is not subject to variable business factors or dependent upon the exercise of business judgment attending the operation of a gasoline station or planned shopping center or a freig’ht terminal. The method used by the court is not a capitalization of hope of expected profits. The actual sales of nearby burial plots were before the court with the prices received and the expenses incurred in connection with the sales.
The Judge of the Court of Claims used the average net unit price obtained in the adjoining garden areas as to the base sale price of the total saleable area affected by the condemnation. He disregarded any increment which would be the profit on the land. The formula applied by the court was: the net average selling price less discount for the deferred realization over the selling period. In this manner the court eliminated any consideration of profit as the discounted sum represents the present worth of the cemetery land less any profit. Evidence of the value of the burial plots, therefore, was not used by the court to allow a loss in business profit but to determine the value of the cemetery land. The compensation awarded was the equivalent in money of the property taken and consequentially damaged.
The principle of substitution, i.e., replacement cost, is not germane. Where the taking splits apart property which is held in one parcel and used for a single purpose by the building of a heavily traveled highway through the property leaving a truncated section, restoration of the use of the property as a unified and combined whole is manifestly impossible. The land taken is irreplaceable by the substitution of other land in a different location. Replacement cost has not been admitted as evidence in measuring the value of vacant land. The same rule applies to condemnor as condemnee. (Matter of New York, Lackawanna & Western Ry. Co., 49 Hun 539; Louisiana Highway Comm. v. Boudreaux, 19 La. App. 98; Jeffery v. Chicago & Milwaukee Elec. R. R. Co., 138 Wis. 1; City of Chicago v. Cunnea, 329 Ill. 288; 2 Lewis on Eminent Domain [3d ed.], pp. 1145, 1146, 1147; 2 Orgel on Valuation under Eminent Domain [2d ed., 1953], § 189.) Evidence of replacement or reproduction cost has been accepted in cases only of structures designed for special purposes, such as the stock exchange, but not as to vacant land.
*47 Mitchell v. United States (267 U. S. 341), Banner Milling Co. v. State of New York (240 N. Y. 533), and Matter of City of Rochester (234 App. Div. 583) involve claims for loss of business and hence have no application. Cemeteries collect substantial income from interment fees, rental of tents and other burial appurtenances, sales of markers and other miscellaneous services. This income, together with income from the increment in value of the burial plots condemned or consequentially damaged would represent future business profits described as damages in those cases. Such evidence does not appear in the record and was not an element of damages allowed. Similarly, cases wherein the evidence was conjectural and speculative are inapposite, such as New York Central R. R. Co. v. Maloney (234 N. Y. 208 and Sparkill Realty Corp. v. State of New York (268 N. Y. 192).
The trial court properly excluded testimony concerning the ashing price of nearby property. (4 Nichols on Eminent Domain, § 12.3113, subd. [3]; 2 Lewis on Eminent Domain [3d ed.], pp. 1145-1146, 1147; 1 Bonbright on Valuation of Property, p. 168; Matter of New York, Lackawanna & Western Ry. Co., 49 Hun 539, supra; 2 Orgel on Valuation under Eminent Domain [2d ed., 1953], § 189, p. 5.)
Finally, the determination of the rate of discount is a factual question and not subject to review.
We find no error of law in the ruling of the Court of Claims, and, therefore, the judgment should be affirmed, with costs.