STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Mis-
souri, Appellant,

v.

Alphonse J. BARBEAU et al., Exceptions of
Joseph E. Ritter, Archbishop of
St. Louis, Respondent.

No. 51104.

Supreme Court of Missouri,
Division No. 1.

Dec. 13, 1965.

Motion for Rehearing or to Transfer to Court
En Banc Denied Jan. 10, 1966.

Robert L. Hyder, Melvin Englehart, Jefferson City, for appellant-plaintiff.

Bernard J. Huger, Walter H. Pollmann, William O. Cramer, St. Louis, for respondent-defendant.

HIGGINS, Commissioner.

■ State Highway Commission petitioned to condemn certain lands for U. S. Highway 66 and Mackenzie Road in St. Louis County, Missouri, and among the lands thus condemned were portions of Resurrection Cemetery, title to which is held by respondent, Joseph E. Ritter, Archbishop of St. Louis. Commissioners awarded respondent $28,246 and both parties filed exceptions which were tried to the court without a jury. The court made findings of fact and conclusions of law and entered judgment for respondent for $37,388, from which State Highway Commission appealed. Appellant conceded that $21,225 was due respondent and the amount in dispute is thus the difference of $16,163 between the conceded sum and the judgment, which amount gives us jurisdiction. Section 477.040, V.A.M.S.; State ex rel. State Highway Commission v. Turk, Mo., 366 S. W.2d 420, 421[1].

The parties stipulated: That the cemetery contained 325 acres prior to the taking; that the date of taking was December 8, 1958; that the taking amounted to 15,750 square feet (0.36 acre); that of the total taking 13,005 square feet are located on the west side of Mackenzie Road and 2,750 square feet are located at the intersection of Mackenzie Road and Highway 66; that an additional 1,036.5 square feet at the intersection was appropriated for a sight distance easement in which no structure or planting could exceed three feet in height.

It is obvious that the stipulated amounts of 13,005 and 2,750 do not total 15,750 and, in making computations, defendant's witness and the court say they used 15,774 square feet as representative of the total taking; however, their computations prove out at the stipulated amount, 15,750.

According to Manley Rice, Jr., Administrator for Catholic Cemeteries of St. Louis, Resurrection Cemetery was founded in 1928 and over 16,000 burials had taken place there. As of March 31, 1961, the cemetery had sold about 1,260,000 square feet of burial space (905,573 square feet sold prior to December 8, 1958), none of which was in Section 1 because the ground there was desirable and reserved for future sale. Of the land sold, 44,800 square feet were sold in fiscal 1954; 45,596 in fiscal 1955; 33,529 in fiscal 1956; 35,442 in fiscal 1957; 35,564 in fiscal 1958; and 29,303 in fiscal 1959, a year in which another cemetery offered a new section for sale and a policy of double burials and reduced grave size was adopted. Although there are some 62 numbered sections in the cemetery, approximately 99 per cent of the burials are in Sections 11, 12, 13, 14, 15, 16, 19, 20, 20A, 20B, 22, and 40. The cemetery does not employ salesmen or offer commissions for sales. In 1931, 78 interments were made in the cemetery and this figure rose to 370 interments in 1940, to 720 in 1958, and to 733 in 1960. Sales will increase considerably because the cemetery is young and salesmen could double and triple sales in a

short time. Resurrection is a memorial-type cemetery rather than a garden cemetery.

Mr. Rice identified several exhibits showing the terrain, entrance, and planning of the cemetery. The land taken was all a part of Section 1, the 2,750 square feet being a triangular parcel at the cemetery entrance at the intersection and the 13,000 square feet being a strip 15 feet wide extending some 860 or more feet from the entrance southwardly along Mackenzie Road. Section 1 is approximately 860 feet long and varies in width from 50 feet to 100 feet. The ground there is fairly level and "rolls away to the creek * * * at the lower (south) end. It is adjacent to completed and developed roads, has accessibility for burial." It contains little timber, the trees there having been placed there for landscaping. Some filling had been accomplished at the low end of Section 1 but it was not fully developed for burial purposes in that corner markers would not be placed until the section was to be offered for sale. Fill dirt is acquired from each burial and filling is a continuous cemetery operation.

Section 2 is the only adjacent section to Section 1 and lies immediately west. Sections 1 and 2 are prime burial sites and are the best or among the best sections in the cemetery due to their physical characteristics and location near the entrance. A limited number of grave plots had been sold in Section 2 prior to 1958. In 1956, two 400 square feet lots were sold in Section 2 at a gross price including endowed care of $3,500 and a net price of $2,100 each, a net land price of $5.25 per square foot. In 1954, 800 square feet were sold there at $7.50 per square foot gross and $4.50 net. In 1951, 858 square feet were sold at $6.87 gross and $5.87 net. Sales in Section 2 prior to 1951 showed: 1939, 133 square feet at $2.25 gross, $1.80 net; 1936, 200 square feet at $1.90 gross, $1.40 net.

Mr. Rice testified that all the area taken was usable for cemetery purposes and was a potential grave area. The strip along Mackenzie Road would accommodate 390 grave spaces and the triangular area would hold 83 spaces, a total of 473 grave spaces. The location of these spaces was shown by a plat with spaces laid out similar to the platting of Section 11 along Highway 66, and the plat showed spaces placed within one foot eight inches of the west edge of the road easement. The taking created a new edge for the cemetery along Mackenzie Road and, to the extent of the new edge, an amount of burial ground has been lost equal to the strip taken.

Prior to the taking the main entrance to Resurrection Cemetery was at the intersection of Mackenzie Road and Highway 66, and it was marked by two limestone pillars about 12 feet high which supported a chain link fence gate. There were roadways 20 to 25 feet wide and the entrance was landscaped with shrubbery. Mr. Rice valued the loss of these improvements at $2,000 and estimated the cost of reconstruction at $4,000. He testified that the area taken for sight distance easement at the intersection was also lost to burial purposes because the provision against structures and shrubs over three feet in height precluded the erection of monuments and screening shrubbery. The taking moved the entrance site southward on Mackenzie Road to where it is no longer visible from the intersection. The new entrance and drive uses 3,090 square feet of the 15,750 square feet taken from Section 1, and it divides Section 1. In the relocation of the entrance plaintiff removed the pavement on 5,480 square feet of the roadway leading into the cemetery from the original entrance. Mr. Rice did not consider it usable for grave space because it was some distance from any roadway, contained no walks, and part of the 5,480 square feet is in the sight distance easement.

Arthur R. Betz, a certified public accountant and an accountant for Resurrection Cemetery since 1951 or 1952, testified as to development costs and their proration on a basis of gross square footage in each section of the cemetery as it develops. Ac-

cording to him, the cemetery obtained a 3.84 per cent rate of return on its investments in the fiscal year ending March 31, 1958, a 3.7 per cent rate of return in the year ending March 31, 1959, a 2.8 per cent return in 1950, and the average rate of return for the years 1957, 1958, 1959, was 3.5 per cent. By the use of Inwood Tables for computing the present worth of money to be received later, he made computations representing the damages sustained by the taking of 15,750 square feet of land valued at $5.25 and $3.50 per square foot discounted for periods of 20 years, 15 years, 10 years, 30 years and 40 years, at discount rates of 3.5 per cent and 6 per cent.

Walter O. Angel, landscape architect for the cemetery since 1952, testified that the value of trees and shrubs lost to plaintiff's taking was $2,000.

Robert C. Walsh, superintendent of Resurrection Cemetery since 1960, testified that the area near a cemetery entrance is the prime and most desirable area of a cemetery; that the location of the gate after the taking was less desirable than the original entrance; and that the ground formerly paved in the original entrance had some use for burial purposes at the disadvantage of long carrying distance.

M. W. Christman, president of Christman Realty Company and general manager of Sunset Burial Park in St. Louis County, Missouri, testified that the ground taken from Resurrection Cemetery was higher than surrounding area and therefore more valuable than lower ground, and he valued the area taken at $5.00 per square foot. He valued the original gate location higher than the relocated gate because of its location on an intersection. In his own cemetery, Sunset Burial Park, graves are located four feet from the boundary line. It was his opinion that graves along a highway should be located ten to twenty feet from the highway. He said also that when an appropriation of land on the edge of a cemetery occurs, the burial line has to move deeper into the cemetery and burial space is lost to the extent the line is moved.

Phil A. McDermott, general manager of Memorial Park Cemetery in St. Louis County, Missouri, testified that the more valuable cemetery land is located close to the entrance on the higher ground, as was the land appropriated here; that similar land in his cemetery would be worth $4.50 to $5.00 per square foot, and in his cemetery interments are permitted within a foot of the line. He valued the land taken from Resurrection Cemetery at a net price of $5.00 per square foot.

Arthur A. Schneider, a real estate appraiser for 35 years, called by plaintiff, testified that the stone entrance had a value of $3,000; that the trees and shrubbery appropriated were worth $900; and that the land taken had a reasonable value of $3.50 per square foot. In his opinion, it would take 20 years to sell all of Section 1 and he assumed 6 per cent, "the going rate of interest," as his discount rate. He also used the Inwood Tables to find present worth and his computation resulted in a land value of $17,325 and, by adding the figures for gate and trees, a total damage of $21,225. In arriving at his value per square foot of $3.50, he averaged the $5.25 which he found to be the price of sales in Section 2 with sales in other parts of the cemetery. The witness recognized that St. Louis County had multiplied in population, that Catholics are usually buried in their cemeteries, and that there were 30 times as many interments in Resurrection in 1958 as there had been in 1929.

From the decree we abstract the following findings of fact:

"3. The actual ground taken consists of 15,750 square feet * * *.

"9. Almost all the ground taken * * * is taken from Section 1 * * *. The ground * * * not located in Section 1 consists mainly of the area * * * by the original entrance and the immediate surrounding area.

"10. * * * The section in the cemetery most comparable * * * to Section 1 is Section 2, which lies immediately to the west of section 1.

"11. Both Sections 1 and 2 are prime burial ground and among the better sections in the cemetery.

"12. There have been no interments as yet in Section 1.

"13. Sales were made in Section 2 in years previous to 1958 * * *, a net cost for the ground only * * * $5.25 per foot.

"18. All the property taken is potential grave area.

"20. After the taking * * * a new edge was created for the cemetery and the amount of burial ground has been lost equal to the quantity of land taken.

"23. * * * The 5,490 square feet from which the asphalt was removed is not desirable for grave space because there are no walks in the area and the area is some distance from the nearest road, thus involving carrying caskets over the turf.

"24. The 1036.5 square feet involving the sight easement * * * is located * * * (in) a critical area, the ground * * * is almost lost for burial purposes * * *.

"27. Sales will increase considerably in the future because the cemetery is relatively young, because the area has multiplied in population and because Catholics are normally buried in a Catholic cemetery, of which Resurrection is one. * * * Section 1 * * * will probably be sold out within thirty years.

"28. The actual rate of return on * * * investments * * * by the cemetery in 1957, 1958, and 1959 was approximately 3.5%."

And we abstract the following conclusions of law:

"1. The 325 acres * * * known as Resurrection Cemetery * * * is land dedicated * * * to cemetery purposes and as such is available and adaptable for cemetery purposes and for no other purposes whatever.

"2. Because the part * * * taken * * * is an integral part of the whole tract, the property taken has no market value in the ordinary sense and the normal rules with respect to the measure of damages in condemnation cases do not apply.

"3. Under these circumstances the appropriate method of finding values * * * is to determine the value of the burial lots or grave sites taken by applying a unit value based upon the average sales price * * * in the adjoining used section of the cemetery, less the reasonable cost of development, sales, maintenance, administration, perpetual care and any other expense affecting its value. The unit value then determined, multiplied by the number * * * taken, less a reduction to present worth for the deferred realization over the selling period, will constitute a guide in determining the value of the property taken. This formula is approved as a proper guide in fixing the value of land taken from a cemetery.

"4. Section 2 is of sufficient similarity with Section 1 to have bearing on the * * * value of Section 1.

"5. Because of the sales made in Section 2, the general topography of Section 1, the highness of ground in Section 1, its proximity to the main gate, its general desirability to the public * * * and the fact that a new edge has been created all along Mackenzie Road by the taking, the fair value per square foot * * * is $5.25; this figure entirely excludes any value based on endowed care, development, maintenance or administration.

"6 The actual rate of return * * * 3.5% is fair and reasonable and should be used here * * *.

"7. Because of the growth of the cemetery * * * 30 years is fair and reason-

able in determining the value of the land taken.

"8. Using the Inwood Tables for deferred realization, which both sides relied upon * * *, the present value of the 15,774 (15,750) square feet taken, based on a unit value of $5.25 per square foot, at 3.5%, over * * * 30 years, is $29,452.00.

"9. The 1,036.5 square feet * * * sight easement is * * * lost for cemetery purposes * * * and its value, based on the same time, interest and unit value as above is $1,936.00.

"10. The reasonable value of the gate * * * is $4,000.00.

"11. The trees and shrubs taken * * * are reasonably worth $2,000.00."

Upon these findings and conclusions the court entered its judgment for defendant for $37,388.

■ Since the parties have presented their positions as to the type of review to be accorded in this case, we restate what we said in State ex rel. State Highway Commission v. Tighe, Mo., 386 S.W.2d 115, 117[3]: "* * * upon appeal of this court-tried condemnation case the general rules apply and the review in this court is necessarily de novo or 'upon both the law and the evidence as in suits of an equitable nature.' Sup.Ct.Rule 73.01(d). * * * The appellate court is admonished that 'The judgment shall not be set aside unless clearly erroneous.'"

Appellant, State Highway Commission, contends that the judgment is erroneous because the court erred: A. In finding the value of land appropriated to be $5.25 per square foot; B. In finding the land appropriated sufficient to constitute 473 grave sites; C. In finding 30 years to be a fair and reasonable time for disposal of all remaining land suitable for grave sites; D. In finding 3.5% to be a fair and reasonable rate of return for determining value.

Appellant concedes that the land taken in this proceeding has no market value in the ordinary sense and that the usual rule for the measure of damages in condemnation should not be applied.

We have not had a case in Missouri dealing with the measure of damages for the taking of land used for cemetery purposes. The problem has arisen in a few jurisdictions and is well-stated in Graceland Park Cemetery Co. v. City of Omaha, 173 Neb. 608, 114 N.W.2d 29, 31[3, 4]: "There are types of property that are not bought and sold on an open market and consequently do not have a reasonable market value within the rule that the fair market value is the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell. The fair market value of property implies proof of sales of similar property in the community as a means of fixing the value of the property taken. When the property is such that evidence of fair market value is not obtainable, necessarily some other formula for fixing the fair value of the property must be devised. This is true, as we view it, of such properties as school yards, church yards, college campuses, buildings under construction, and cemeteries. 1 Orgel on Valuation under Eminent Domain, s. 38, p. 175. We hold, therefore, that in the taking of land used for cemetery purposes the measure of damages is not the fair market value of the land for the simple reason that such property has no fair market value. Whenever the property is of such character and nature that it has no fair market value in the ordinary sense, its value for the uses and purposes to which it is being devoted and to which it is peculiarly adaptable may be shown. Idaho-Western Ry. Co. v. Columbia Conference of Evangelical Lutheran Augustana Synod, 20 Idaho 568, 119 P. 60, 38 L.R.A.,N.S., 497; City of Chicago v. Farwell, 286 Ill. 415, 121 N.E. 795. One text writer refers to the measure of damages in such a case as the determination of the specialty value to the owner. Jahr, Eminent Domain, Valuation and Procedure, s. 82, p. 116." That court proceeded, 1. c. 32[5], to develop a rule for such cases: "An ap-

propriate method for finding the value of land taken, which was being used for cemetery purposes, is to determine the value of the burial lots or grave sites taken by applying a unit value based on the average sales price per lot or grave site in the adjoining used section of the cemetery, less the reasonable cost of development, sales, maintenance, administration, perpetual care, and any other expense affecting its value. The unit value thus determined, multiplied by the number of lots or grave sites taken, less a reduction to present worth for the deferred realization over the selling period, will constitute a guide to the jury in determining the value of the property taken. St. Agnes Cemetery v. State, 3 N.Y.2d 37, 163 N.Y.S.2d 655, 143 N.E.2d 377, 62 A.L.R. 2d 1161."

■ We approve this formula as a proper guide in fixing the value of land taken from a cemetery as in our case. This is the formula stated in the trial court's conclusion of law 3, set out above, and appellant concedes the formula to be proper, its disagreement going only to the manner of application of the formula and to the determination of unit value, grave sites, selling period, and rate of discount.

Appellant contends (A) that the court did not obtain an average price per unit as required by the rule. The argument is that the court failed to consider the average sale price in the adjoining section, Section 2, and that it did not consider the average over the entire cemetery.

The square foot was chosen as the unit for appraisal of damages for the loss of unused burial ground and that choice is supported by St. Agnes Cemetery v. State of New York, 3 N.Y.2d 37, 163 N.Y.S.2d 655, 143 N.E.2d 377, 381[7–9]: " * * * the weight of authority supports the rule that if the land taken is an integral though unused portion of a well-established cemetery, that is, a portion of a cemetery in which there have been no interments and no sales of graves, the property should be appraised on the basis of its value for ceme-

tery purposes. The fact that there were no burials in the condemned or consequentially damaged parcels is proof of damage to the cemetery (Cementerio Buxeda v. People of Puerto Rico, 1 Cir., 196 F.2d 177, certiorari denied 344 U.S. 876, 73 S.Ct. 170, 97 L.Ed. 678, supra). The quantum of damage depends on the value of the plots. The unit of appraisal may be the value per square foot of the burial plot or the value of the burial plot as a whole (Finkel, Condemnation Appraisal of a Cemetery [Appraisal Journal, July, 1955, American Institute of Appraisers, pp. 379–386], supra; Cementerio Buxeda v. People of Puerto Rico, supra; Elmhurst Cemetery Co. of Joliet v. Commissioner of Internal Revenue, 300 U.S. 37, 39, 57 S.Ct. 324, 81 L.Ed. 491)." As in our case, in Cementerio Buxeda v. People of Puerto Rico, 1 Cir., 196 F.2d 177, 179, " * * * the condemned parcel was at the frontal part of the cemetery property, its most valuable part as appears from the record. It was an integral part of the whole and was dedicated to cemetery purposes and was restricted to that use and no other use * * * "; and we said in City of St. Louis v. Vasquez, Mo., 341 S.W.2d 839, 850[26, 27]: "Sales of land of like character and similarly situated to that in question, not too remote in point of time, are admissible on the question of value as an aid to the jury in determining the damages to which the owner is entitled. City of St. Louis v. Kisling, Mo.Sup., 318 S.W.2d 221. The importance of other sales depends not only on their proximity in point of time but also upon 'similarity in location, and *in the uses to which the properties may be adaptable,'* * * *. It is for the trial judge to exercise a wise judicial discretion in determining whether the two parcels are of sufficient similarity to have some bearing on the question of value." See also State v. Lincoln Memory Gardens, Inc., 242 Ind. 206, 177 N.E.2d 655, 659[6].

Respondent's evidence showed Section 1 and its adjoining section, Section 2, to possess similar characteristics as prime burial ground in the "frontal" area of the ceme-

tery; comparative sales in Section 2 were for net prices of $5.87 per square foot in 1951, for $4.50 in 1954, and for $5.25 in 1956, and witnesses Christman and McDermott gave their opinion that the land taken was among the most valuable and worth $5.00 per square foot. Plaintiff's witness, Schneider, arrived at $3.50 net per square foot by averaging the property taken with sections in the cemetery other than the adjacent section, and he considered those sections and the land taken as "average."

■ The rule in the cases cited does not require the court to consider burial sites which are dissimilar in value and character to the land in question, and City of St. Louis v. Vasquez, supra, limits the comparison of sales to those "not too remote in time." The trial judge resolved the conflict in the testimony in favor of a unit value of $5.25 per square foot, and our review indicates that such finding should not be disturbed.

■ Appellant contends (B) that the evidence is insufficient to sustain the court's determination that the land appropriated would constitute 473 grave sites. The argument is that in order to obtain 473 grave sites in the land taken it would be necessary to place 390 grave sites within one foot eight inches of the cemetery line on MacKenzie Road and to put 83 spaces in the triangular parcel would require putting some spaces outside of the original entrance. The trial court's finding in this respect is that "all the property taken is grave area." Respondent had evidence which was disputed by appellant to show that the area taken was the best part of the cemetery and that a cemetery uses all its ground for cemetery purposes. The significance of the court's finding is that the area taken, i. e., 15,750 square feet, could accommodate 473 grave sites and not that such sites were located there. The important thing is not whether graves could or could not, or would or would not, be placed at the boundary or edge of the cemetery, but rather that the loss of the property taken was a loss of that much land available for cemetery pur-

poses demonstrated in terms of lost burial sites.

■ Appellant also argues that it was error to consider the 1,036.5 square feet sight easement as lost for cemetery purposes because the cemetery would have use of the area except that nothing could be maintained or grown there over three feet in height. The evidence showed that this area had been landscaped prior to the taking to provide a screen against Highway 66 and business properties on the highway. The height restriction makes this impossible as well as the erection of memorials over three feet in height in this memorial cemetery, and the area is thus lost to cemetery purposes.

Appellant also argues that the court erred in considering that the part of the 15,750 square feet taken lying outside the original entrance had the value of $5.25 per square foot as found by the court because it would not have been used for burial purposes. This argument is akin to that made above in respect to the number of potential grave sites lost; it is in part answered by the discussion there and it is clear from the evidence that the entrance area is a prime and essential use of the cemetery property, loss and relocation of which causes the loss of ground otherwise available for burials.

■ Appellant argues finally on his contention with the finding that the 5,480 square feet from which pavement was removed was not desirable grave space. This area, of course, was not a part of the taking and no damages were allowed in respect to it by the court. The evidence was that Mr. Rice did not consider the area usable for grave space because of its distance from any roadway and its lack of walks, and Mr. Walsh felt any use of the area was at the disadvantage of long carrying distance. This would justify the court's finding, and we are not directed by plaintiff to any evidence to the contrary or of special benefit in respect to this area.

■ Appellant's contention (C) is that the court erred in choosing a time factor of

30 years for the *disposal of the cemetery*. The argument is that if the average sales per year in the cemetery were divided into number of square feet of available burial ground the length of time required to sell the remainder of the land or the economic life of the cemetery would be 325 years. An examination of the court's finding and conclusion shows at once the fallacy of this argument because the court found and determined only that *Section 1* would probably sell out within 30 years and that 30 years is a fair and reasonable time to use in applying the formula for determining the damages to land in *Section 1*. In making the determination the court had for consideration the growth of the cemetery, the growth of population in the area served, the attraction of the cemetery to the Catholic population, that Section 1 would be sold out quickly because of its desirability and, finally, and most persuasive, the testimony of appellant's witness Schneider who stated that *Section 1* would be disposed of in 20 years, a figure which would be more favorable to respondent than the 30 years determined by the court.

▮ Finally, appellant contends (D) that the court erred in determining 3.5% to be the fair and reasonable rate of return for the purpose of determining value. Respondent's evidence was that the cemetery obtained a 3.84% return on its investments in the fiscal year ending March 1958; 3.70% return in the year ending March 1959; and 2.8% return in 1950. The average actual return for 1957, 1958, and 1959 was 3.5%, and Mr. Betz used this figure in the computations which he initiated. The court characterized the 3.5% as actual rate of return and determined it to be a fair and reasonable rate to use as a discount figure in applying the damage formula. The only other percentage suggested was that of 6% assumed by appellant's witness Schneider. 3.5% is consistent with current yields and conditions in safe investment of funds, and in St. Agnes Cemetery v. State, supra, and Mount Hope Cemetery Ass'n v. State of New York, 11 A.D.2d 303, 203 N.Y.S.2d 415, New York courts used 2% as the rate of discount in applying the same formula used here.

▮ Although the disparities are not as great as in some cases, our statement and discussion point up the existence of conflicts in the testimony and, necessarily, therefore, "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Civil Rule 73.-01(d). The court determined that the formula should contain the factors of $5.25 per square foot unit value, 3.5% discount rate (Inwood coefficient .3563) for determining the present value of deferred realization and a 30-year period, which, combined, make the value of each $5.25 unit $1.87; the damages thus found for the taking of 15,750 square feet amounted to $29,452; and in the same way the court determined the damages for the 1,036.5 square feet sight easement at $1,936. The court found also that the value of the gate taken was $4,000, and the damage to trees and shrubs was $2,000, neither of which figures are questioned on appeal.

The above amounts constitute the judgment for $37,388 entered in favor of respondent. This court on its review anew finds the facts and the damages as the trial court found them, and accordingly affirms the judgment.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.