## REST HILLS MEMORIAL PARK, INC. and GRIFFIN-LEGGETT, INC. *v.* CLAYTON CHAPEL SEWER IMPROVEMENT DISTRICT NO. 233

CA 81-318                                    639 S.W.2d 519

Court of Appeals of Arkansas
Opinion delivered September 29, 1982

*Wallace, Hilburn, Clayton, Calhoon & Forster, Ltd.,* by: *Larry C. Wallace* and *Janet L. James,* for appellants.

*Townsend & Townsend,* by: *Willis V. Townsend,* for appellee.

JOHN CHARLES EARL, Special Judge. This Appeal involves a condemnation of lands owned by the Appellants, Rest Hills Memorial Park, Inc. and Griffin-Leggett, Inc. (collectively referred to hereinafter as "Rest Hills"). In 1976, Appellee formed Clayton Chapel Sewer Improvement District No. 233 of Pulaski County, Arkansas (hereinafter referred to as "District"). Although Appellants' lands are not within the District, the Appellee's sewer lines run across the Appellants' lands in three easements in order to connect to the sewer treatment plant which serves the sewer district. The Trial Court determined that the easements constituted a total of 1.7 acres taken and that Rest Hills was entitled to $34,494.32, representing the value of this 1.7 acres, with interest thereon at the rate of six percent (6%) per annum from the date of taking. Much of the Trial Court record is devoted to testimony concerning the elevation of lands taken. The Chancellor found that the State Health Department will not allow burials on lands below an elevation of 247' Mean Sea Level (MSL). Of the total lands condemned by the District, .43 acres lie above 247' MSL surface contour and 1.27 acres lie below such elevation. In a cemetery enterprise, land which is suitable for division and sale as individual burial plots is much more valuable to the landowner than land which cannot be used for such purposes. The Chancellor found that the land currently available for burial use had a value of $49,964.62 per acre and the Chancellor applied this value to .43 acres of the condemned lands with surface contour elevations higher

than 247' MSL. The remaining 1.27 acres of the condemned property was not viewed as being suitable for burials, and was valued at $5,500.00 per acre.

Appellants have urged that the Chancellor, by failing to value the entire 1.7 condemned acreage as burial property, failed to award damages to the Appellants based upon the highest and best use of their land. Appellants further urge that the Chancellor committed error in the amount of interest allowed on the judgment. We agree.

It has long been the rule that when one's property is taken under the law of eminent domain, just compensation to the owner is measured by the difference in the value of the land, when put to its highest and best use, immediately prior to the taking and immediately after the taking. *Arkansas State Highway Commission* v. *Maus,* 245 Ark. 357, 432 S.W.2d 478 (1968); *Myers* v. *Arkansas State Highway Commission,* 238 Ark. 734, 384 S.W.2d 258 (1964); *State ex Rel Publicity and Parks Commission* v. *Earl,* 233 Ark. 348, 345 S.W.2d 20 (1961). Further, in determining the highest and best use of the land taken, the Court may consider all uses to which the land is adapted and might be put and may award compensation upon the basis of its most advantageous and valuable use. *U.S.* v. *620.00 Acres of land, more or less, situate in Marion County, Arkansas,* 101 F. Supp. 686 (W.D. Ark. 1952). In determining future uses, the Court may not engage in speculation and conjecture but must be shown with some degree of certainty that the use of the land will change in the not too distant future. *Arkansas State Highway Commission* v. *O & B, Inc.,* 227 Ark. 739, 301 S.W.2d 5 (1957).

The Chancellor properly found with some degree of certainty that .43 acres of the total 1.7 acres taken could be used for burial purposes in the reasonably near future and should be valued at a rate suitable for burial property. This finding was based upon testimony presented in the Trial Court and reflected in the record that although the .43 acres is not currently used for burial purposes, it is currently suitable for such use. Further, the record reflects that the remaining 1.27 acres taken had been cleared and sodded, had

been platted and planned for burials, and had been approved by the proper cemetery authorities for cemetery use.

From a review of the transcript, it seems that both parties agree that the total 1.7 acres taken was intended to be used for burials. The disagreements presented on appeal are: (1) whether the total 1.7 acres could be legally used for burial purposes; and (2) whether some parts of the 1.7 acre area taken would be suitable for burials in the not too distant future, since it lay in varying degrees below 247′ MSL.

However, before reaching either of these issues, it must be determined whether 247′ MSL refers to the surface of the property or the floor of the grave. The Chancellor found that the .43 acres with an elevation of 247′ MSL and above were currently suitable for burial property. Appellee has urged on appeal that the 247′ MSL requirement refers to the *floor* of the grave and not to the *surface* elevation of the property. However, after reading the transcript of the Trial Court proceedings, it is clear that this elevation referred to the *surface* contour and the elevation of the surface was the subject to the parties' arguments below.

It is further noted that Appellee has not questioned the finding that the .43 acres at or about 247′ MSL *surface* elevation is suitable for burials, thus strongly indicating Appellee's agreement that any lands with *surface* elevations of 247′ MSL and above may be used for burials. If the reference were as Appellees argue on appeal, then surely their appeal would have included, at least, a part of the valuation of the .43 acres.

As regards Appellants' ability to legally use the entire 1.7 acres for burial purposes, the only impediment seems to be that 1.27 acres is currently below 247′ MSL, since the entire tract is currently approved for cemetery use. We find the Appellee's reference to a letter from the State Health Department unpersuasive as, in our view, it applies to a recommendation for future rules. The record reflects no evidence that the State Health Department, the Corps of Engineers or the necessary authorities or agencies would prohibit raising the level of the 1.27 acres in dispute which

are currently below 247' MSL. We find undisputed evidence that of the lands condemned, 1.27 acres below 247'MSL can, in fact, be raised to the 247'level and that such act on the part of the cemetery owner is legally permissible. It also appears from a review of the proceedings below that Appellants are continually raising the surface level of low-lying cemetery lands with excess dirt displaced by burials. Indeed, the Chancellor below recognized this fact and the testimony appears undisputed that it is less expensive for the Appellants to use excess earth in this manner as opposed to paying someone to haul it away.

Appellants rely upon the *St. Agnes* rule of cemetery appraisal which was set out in *St. Agnes Cemetery v. State,* 163 N.Y.S.2d 655, 3 N.Y.2d 37 (1957), in which the Court held that if land taken is an integral though unused portion of a well-established cemetery in which there have been no interments and no sale of graves, the property should be appraised on the basis of its value for cemetery purposes if such value can be arrived at without resorting to speculation. Appellants urge that the *St. Agnes* rule of damages should apply in this particular condemnation where the cemetery is a well-established business, the lands taken are very near lands in which burials have already been made, and the lands taken will be used for burials in the near future.

The cases which follow the *St. Agnes* rule have held that the condemned portion of a cemetery should be valued as having burial purposes if the land is held by the landowner for definite future cemetery use as a part of an established cemetery enterprise and if the value as burial property can reasonably be arrived at. *Mt. Hope Cemetery Association v. State of New York,* 203 N.Y.S.2d 415, 11 A.D.2d 303 (1960); *State ex rel v. Barbeau,* 397 S.W.2d 561 (Missouri, 1965); *Graceland Park Cemetery v. City of Omaha,* 173 Neb. 608, 114 N.W.2d 29 (1962); *Cemeterio Buxeda v. People of Puerto Rico,* 196 F.2d 177 (1st Cir., 1952). The *St. Agnes* method of cemetery appraisal is adopted as the general rule in condemnation of cemetery property in Arkansas.

In arguing the Chancellor correctly refused to value the

1.27 acres as burial property, Appellee District cites *Laureldale Cemetery Company* v. *Reading Company*, 303 Pa. 315, 154 A. 372 (1931), which is an exception to the general rule, properly applied, when valuation of property for future cemetery use is too speculative. *Laureldale* involved a valuation of condemned property based upon non-cemetery use since the part taken was not being used for burials, was some 600 feet from existing graves and was not certain to be used for burials in the near future. The Laureldale Cemetery was only three and one-half years old at the time of taking. The Court in *Laureldale* held that it was too speculative to attempt to place the higher burial value on the condemned portion of the cemetery when the cemetery was so new as to make a projection of the future sales of individual grave sites uncertain. We find the *Laureldale* theory was properly applied in *Diocese of Buffalo* v. *State of New York*, 300 N.Y.S.2d 328, 24 N.Y.2d 320 (1969), wherein that Court held that where a cemetery consists of so much land that the portion retained after the taking is so large that it would be 88 years before the property would be fully utilized for gravesites that the owner would be better advised to put the land to another use, then the land should be appraised for non-cemetery purposes.

In relying on the *Laureldale* theory, Appellee District has pointed out some facts that must be analyzed and resolved here. After the taking Appellants are left with 108.566 acres of the 110.266 owned by them and approximately 61.02 acres may never be used for burials and may never yield income. This fact, on its face, would seem to impose the *Laureldale* rule of evaluation. However, the record reflects undisputed testimony that 61.016 acres of the land retained (none of which embraces the condemned 1.7 acres) is swamp land known as Trammel Lake. The U.S. Corps of Engineers prohibits the filling of this 61.016 acres (which would be necessary in order to be used for burial purposes) because it falls within a federally protected area. The Trial Court stated in its Findings of Fact and Conclusions of Law that the Federal Wetland Act prohibits raising the level of the 60.016 acres located in this swamp and that it could not be used for burials. Although Appellants hold title to Trammel Lake it cannot be used for burials and is not

considered by them a part of the cemetery proper. Thus, these facts do not support Appellee's contention that *Laureldale* is applicable in this case.

The record reflects that all of the area condemned by the District is outside the swamp area and is presently available for use as burial property with the exception of 1.27 acres which lie below 247' MSL elevation. The record further reflects that approximately 1800 cubic yards of dirt are displaced each year by burials and that this excess is presently carried to low lying portions of the cemetery. It is easily seen that this practice results in raising the elevation of certain lands in the cemetery to a level which would then be suitable for burials. Appellee's brief reflects that to raise the area of the easements by 4 feet, to 247' MSL (some of which is apparently only a few inches below that level) would require 8,382 yards of fill. Given 1800 yards of fill a year the testimony reflects is presently being removed from new graves, a basic calculation would show that this 1.27 acres could be totally raised to the 247' MSL in 4 years and 8 months, based upon the past and current rate of burials within the Appellants' cemetery. Clearly, the *St. Agnes* method of valuation would apply to the Appellants' situation where all of the lands condemned would be available for burial sites in this short period of time. This Court agrees with the Court in *St. Agnes* when it said that the question to be answered is "what has the owner lost? not, what has the taker gained?"

The Chancellor, in his Findings of Fact and Conclusions of Law, recognized the possibility that the lands below 247' MSL elevation could be raised to a higher level and be suitable for burials; however, he went on to say that "the award for such a taking must be based upon present conditions". In view of the Court's finding that lands taken below 247' MSL could be raised and the undisputed testimony of the Appellants in the record that such would be done, it was error for the trial court to award a value of $49,964.62 per acre to .43 acres taken and $5,500.00 per acre for the remaining 1.27 acres taken. An award of damages for land taken may be based upon prospective utilization of the land if such proposed use is fairly certain and if the land can

be valued as such without resorting to speculation. *Arkansas State Highway Commission* v. *O & B, Inc., supra; U.S.* v. *620.00 Acres of Land, More or Less, supra; Arkansas State Highway Commission* v. *Watkins, supra.* Based upon the record and the Chancellor's findings that the lands condemned are part of an established cemetery enterprise and, although not currently *used* for burial purposes, will be *suitable* for such use, the highest and best use of all the land condemned is for cemetery purposes and thus an award must be based upon that use. We find, therefore, that the entire 1.7 acres taken by the Appellee District should be valued as burial property and that the Appellants are entitled to $49,964.62 per acre for the entire 1.7 acres condemned by the Appellee.

The second issue raised on this appeal pertains to the proper rate of interest on a judgment for damages in condemnation actions.

The original decree was signed by the Chancellor on May 29, 1981, and contained no provision for interest on the award. Appellants then filed a Motion for an Amendment of the Decree seeking interest at the rate of Ten Percent (10%) from the date of taking. On June 24, 1981, the Chancellor amended the May 29, 1981, decree to provide for interest from the date of taking at Six Percent (6%) per annum.

The Chancellor properly found that: (1) Appellants were entitled to interest on the full award from the date of taking which was the date of the Order of Entry; and, (2) if the landowner does not have the use of the money during this time, to deny him interest would be to deny him just compensation, *Housing Authority of the City of Little Rock* v. *Rochelle,* 249 Ark. 524, 459 S.W.2d 794 (1970). The question now before us is what rate of interest that award shall bear from the date of taking. Ark. Stat. Ann. § 29-124 provides *"shall* be allowed to receive interest at the rate of Ten Percent (10%) per annum on any judgment". (emphasis added) This language is mandatory barring discretionary reduction by the Trial Court. Appellee urges that prejudgment interest is limited by *Ark. Const.* Art. 19, Sec. 13 to 6% per annum. We agree. Further, Appellee urges that it is

within the Chancellor's discretion, according to Ark. Stat. Ann. § 29-124, to also reduce postjudgment interest to 6%. With this we also agree. Thus, we are squarely presented with the issue of whether the Trial Court actually exercised its discretion to override the mandatory language of this statute.

In stating his reasons for providing for 6% interest, the Chancellor below stated:

"The only reason why I am providing 6% is that I am attempting to follow the Highway Department's statute, although I am well aware that it does not apply. It is the only one I know of that has any provision for interest on the award."

A similar occurrence is reported in a 1976 case, *Dunn Roofing Company v. Brimer,* 259 Ark. 855, 537 S.W.2d 164 (1976). In that case, counsel submitted a precedent for judgment reciting a 10% rate. The Court, in its opinion, stated:

"For more than a century, the interest rate upon judgments was 6%, but in 1975, the legislature increased the rate to 10%, with a proviso that the Trial Judge, in his discretion, may reduce the rate to not less than 6%. Ark. Stat. Ann. § 29-124. Here counsel submitted a precedent for judgment reciting a 10% rate. The Judge reduced it to 6% explaining in a letter that he understood the legal rate to be 6% in the absence of a contract for a higher rate. No other explanation of the reduction appears in the record. Hence, it does not appear that the Court exercised its discretion with knowledge of the 1975 statute. Consequently, we think that the rate should be fixed at 10%, as the statute provides, not because the Trial Judge abused his discretion, but because he was not apparently aware of the leeway open to him." 259 Ark. 855 at page 857.

In the instant case, it clearly appears that the Chancellor was not aware that he must affirmatively exercise his discretion to override the mandatory provision for 10%

interest in Ark. Stat. Ann. § 29-124 which applies to all judgments except those involving condemnation by the State Highway Department. *Arkansas State Highway Commission* v. *Scott*, 264 Ark. 397, 571 S.W.2d 607 (1978). To follow an inapplicable statute or do the "logical thing" is not sufficient in the absence of an indication that an exercise of discretion was the basis for that act. We do not find any place in the record of the proceedings where the Trial Court truly exercised its discretion to override the mandatory language of the statute. We therefore hold that Appellant's judgment should bear interest at the rate of 6% from the date of the Order of Entry to the time of judgment and at the rate of Ten Percent (10%) from the date of the lower court's judgment until satisfaction.

This Court will not remand Chancery causes for further proceedings and proof when it can plainly see from the record what the rights and equities of the parties are, but will render such a decree as ought to have been rendered below. *Walt Bennett Ford, Inc.* v. *Pulaski County Special School District*, 274 Ark. 208, 624 S.W.2d 426 (1981); *Ferguson* v. *Green*, 266 Ark. 556, 587 S.W.2d 18 (1979).

We therefore render such decree as ought to have been rendered by the Chancellor below on May 29, 1981. In doing so, we reverse in part and affirm in part the Chancellor's decision, and hold that the Appellants are entitled to judgment in the sum of $84,939.85 with interest thereon at the rate of 6% per annum from the date of the Order of Entry (January 9, 1980) to the date of judgment and interest at the rate of 10% per annum from the date of judgment (May 29, 1981) until satisfied.

MAYFIELD, C.J., and CRACRAFT, J., dissent.

COOPER, J., not participating.

GEORGE K. CRACRAFT, Judge, dissenting. I am in complete agreement that the law applicable to this case is as stated by the majority and I agree that the so-called "St. Agnes rule" of cemetery appraisal is a sound one when applied in the proper case. If the land condemned is an

integral, though unused, portion of a well established cemetery the property should be appraised on the basis of its value for cemetery purposes, but there are several limitations to this rule. *St. Agnes* and *Mt. Hope Cemetery Association* point out some of them. It is not enough that the condemned area lie within the confines of a well established cemetery. It must be further shown that the area condemned was "available" and "suitable" for that use before it should be valued the same as areas presently being utilized. Another limitation imposed on this rule, as stated by the majority, is that the condemned area's value as burial property must be capable of reasonable ascertainment without resorting to speculation. A third limitation on this rule is set forth in *Laureldale Cemetery Co. v. Reading Company* and *Diocese of Buffalo v. State of New York,* also cited by the majority. The time at which the tract will be utilized for burial purposes must not be so indefinite as to render the area incapable of present evaluation for the intended purpose.

While the majority appear to have recognized that these three limitations are valid, in my view they have chosen to ignore two of them in this case. The record shows that .43 acres of the condemned land lay in an area that was presently "available and suitable" for burial purposes. It was perfectly proper for the trial court to value that area as burial lots. On the other hand, 1.27 acres lay in varying depths beneath the elevation at which they could be utilized for burials under existing regulation. In my view this tract was not shown to be presently either "available" or "suitable" for burial. Its value, therefore, was not the same as the other area and I depart from the majority's conclusion that it was.

As stated by the majority some of the 1.27 acres in issue was required to be raised by 4 feet. Some of it was only a few inches below the required level. There was evidence that it would take a total of some 8,382 cubic yards of dirt to raise the entire area to the required level. The majority calculate that at the current rate of 1,800 yards displacement per year the result could be accomplished in four years and eight months. There is, however, nothing in the record on which the *cost* of removal of the displaced dirt could be calculated. Based on practical considerations, I also question the

accuracy of their rather speculative conclusion on *de novo* review that the area would be suitable for burial immediately upon completion of the loose earth fill. I recall no evidence tending to prove that it would.

The majority passed by the cost problem by simply stating that the testimony indicates that it would be cheaper for appellee to use the displaced dirt for this purpose than to haul it to another location. It is obvious to me — and must have been to the chancellor — that even in hallowed ground displaced dirt will not move, pack, slope or sod itself. There will be labor and other cost incurred by appellee in moving it. It is noted that the dirt was to be moved to the fill area on a grave by grave basis. The expense and man hours required to move it would be greater, therefore, than if all the dirt were moved at one time or in larger truckloads. It is a matter of common knowledge that a wheelbarrow full of loose dirt will not permanently fill a hole the size of the container. After each heavy rain additional dirt would have to be moved to that site unless the packing process has been accomplished. The difficulties are compounded when as here the dirt-fill is on a slope where erosion must be considered.

In my view the burden was upon the appellee to show to the satisfaction of the court the cost of placing this land in condition for its highest and best use in order that the court might make the proper mathematical deduction for the cost from the established market value of other burial lands. It is my further view that as appellee failed to meet the burden or even introduce evidence bearing on the point, the chancellor's unwillingness to speculate on those costs ought to be sustained by this court. There was no evidence before the chancellor at the trial nor for us on *de novo* review from which the cost of accomplishing this result can be ascertained.

The cost factor might have been minimal. On the other hand it might have been very substantial. The task might have been accomplished in a short period of time or it might not have been accomplished for years. I can't tell from the record what the answers are and I do not understand how the majority has been able to do so.

I would conclude that appellee has failed to sustain its burden of proving the fair market value of its property for burial purposes in its present condition and left that determination to sheer speculation. Absent that proof I agree with the Chancellor that the 1.27 acres could not be valued as burial lots.

I am authorized to state that Chief Judge Mayfield joins in this dissenting opinion.